Argued November 8, 1977, affirmed as modified and remanded
February 8, 1978

WELLS et al, *Respondents,*
*v.*
JONES, *Appellant.*
(No. 73-523-E, SC 25164)

574 P2d 636

Donald F. Myrick, Grants Pass, argued the cause for appellant. With him on the briefs were Donald H. Coulter, and Myrick, Coulter, Seagraves, Nealy & Myrick, Grants Pass.

Richard V. Kengla, Grants Pass, argued the cause for respondents. With him on the brief were Kengla and Cromwell, Grants Pass.

Before Holman, Presiding Chief Justice, Tongue, and Bryson, Justices, and Richardson, Justice Pro Tempore.

BRYSON, J.

## BRYSON, J.

This is a suit for specific performance of an agreement for the sale of the corporate shares of Electrical M & W Supply Company together with most of the assets and inventory of the business. Defendant and his wife own the common shares.[1] The parties agreed that there was a written contract; they differed only as to the computation of the closing price or balance to be paid to defendant by plaintiffs. The trial court granted specific performance, directed transfer of the common shares of the corporation to plaintiffs, together with certain books and records, at the price contended by plaintiffs-buyers. Defendant-seller appeals.

At the time of argument both parties agreed that, other than attorney fees, the only issue on appeal is whether "[t]he trial court was in fundamental error" in construing the facts in relation to a clause in the contract pertaining to the purchase price. There are no legal issues involved. We review de novo.

■ The parties began negotiating for the sale and purchase in November, 1971. The Stock Sale Agreement was executed March 20, 1972, and antedated to March 1, 1972, for the closing date. It was agreed that defendant would withdraw certain assets from the corporation (real estate and contract building business, etc.). The sale price was $31,735.[2] Prior to execution of the contract, the following language was inserted:

> "Purchase price will be adjusted by difference, if any, between January 31 and February 29, 1972 balance sheets."

The interpretation of this clause as it pertains to "balance sheets" and the fact that defendant withdrew certain of the assets poses the factual controversy here

---

[1] The assets and all except 50 shares of the common stock had been transferred before trial but the purchase price had not been determined.

[2] The original price was rounded off to $40,000 and then adjusted to $31,735.

involved. Four exhibits were introduced to determine the purchase price in relation to the "balance sheets" as stated in the contract. Plaintiffs introduced exhibits 1 and 2, and defendants introduced exhibits C and D.

During negotiations for the sale, defendant-seller presented plaintiffs with exhibit 1, which is entitled "Statement of Assets and Liabilities January 31, 1972," which defendant characterizes as a "negotiating sales tool." Exhibit 1 was prepared by defendant's accountant, Basker. It listed in some detail the assets and liabilities of Electrical M & W Supply Company, showing net assets of $88,451.95 and an excess of assets over liabilities of $19,504.01.

During the negotiations and before execution of the contract, defendant also produced certain computerized statements represented by defendant's exhibits C and D. These exhibits contain the balance sheets for defendant's *combined* businesses (prior to withdrawal of assets by defendant) as of January 31, 1972, and February 29, 1972. The relevant figures for that part of the business that plaintiffs were to buy were not separately stated in exhibits C and D.

Plaintiff Wells testified that he and defendant used exhibit 1 in arriving at a preliminary price:

"A Well, fundamentally we used the net worth as reflected by the balance sheet provided myself and John [plaintiff Gerber] by Mr. Jones [defendant] as an * * * [account and] which shows a net worth of $19,504.01.

"* * * * *.

"Q So utilizing the net worth figure as disclosed by that, what was the next step?

"A To determine how much—for lack of a better word—blue sky might merit and 20,000 was the figure which was developed. Which the 19,504 and the 20,000, we arrived at a total of 39,504 and rounded it off to an even 40,000."

Defendant confirmed that this was how the parties reached the preliminary price. The parties signed the contract on March 20, 1972. The contract was drafted by defendant's attorney.

[ 276 ]

After the business had been transferred, accountant Basker prepared another balance sheet, giving the state of the business as of February 29, 1972. This is exhibit 2. No one contests its accuracy. This new balance sheet showed net assets of $70,344.21, and a net worth of $4,212.89. This was a reduction of $15,291.12 from the net worth of $19,504.01, as shown by exhibit 1.

In contrast, exhibits C and D showed a net reduction in net worth of $2,799.26 for defendant's *combined* businesses (before withdrawal of assets from corporation).

We conclude that plaintiffs' interpretation of the contract is correct, based on several factors. Most persuasive is the fact that exhibits C and D did not separately state the assets and liabilities of that part of the business that was to be sold. As plaintiff Wells testified:

> "This combined statement of operations that you [defendant's attorney] keep presenting to me has no validity in our discussions as much as it reflects not only assets but liabilities to a great extent and quite a number of dollars that we did not receive."

It is also clear from the testimony that the parties, while negotiating, relied primarily on exhibit 1, more so than on exhibits C and D. Further, defendant himself testified that he discussed exhibits C and D with plaintiffs only "vaguely." Thus, it was never made clear just what exhibits C and D meant with respect to that part of the business that was sold. It seems far more likely that the term "balance sheets" was intended to refer to documents that covered the business to be sold rather than to documents that covered defendant's combined operations.

The next factor involves timing. Both exhibits C and D were available on March 20, when the contract was signed. If the parties intended to adjust the price for the difference between the balance sheets and if by "balance sheets" they meant exhibits C and D, then

they could simply have entered the difference. Instead, they stated a method by which the adjustment in price would be determined if the relevant documents became available after the contract was signed. This is consistent with plaintiffs' interpretation of the term "balance sheets" because exhibit 2 was not available until March 31, 1972.

We also conclude that the term "balance sheets" refers to exhibit 1 because it was used to set the preliminary price. It seems inconsistent, to say the least, to rely on exhibit 1 as a basis for setting the price but then to reject exhibit 1 as an accurate statement of the assets and liabilities of the business. We therefore conclude that the term "balance sheets," as used in the contract, referred to exhibits 1 and 2.

■ The next issue involves the amount by which the purchase price should be reduced. It is apparent from the trial court's memorandum that the court simply subtracted the net worth stated in exhibit 2 from the net worth stated in exhibit 1 and arrived at a reduction of $15,291.12. This is incorrect, as plaintiffs conceded in their written closing argument submitted to the trial court, which is part of the trial file:

"Mr. Richard Elam, CPA, testified that the difference between the two balance sheets introduced into evidence by Plaintiffs was a gross figure in the amount of $15,291.12. Plaintiffs concede that pursuant to the terms of the Stock Sale Agreement they were obligated to purchase the Steek Electric account and that they were further obligated to purchase the machinery and equipment without reference to the accumulated depreciation. Adjusting the gross difference between the January 31st and February 29th balance sheets for these two items leaves a net difference of $8,894.77."

The $8,894.77 figure is indeed supported by the testimony of plaintiffs' expert Elam. Therefore, the purchase price should have been reduced by $8,894.77, not by $15,291.12.

Defendant argues that the reduction should be even less. He argues that plaintiffs' $8,894.77 figure leaves

[ 278 ]

out a $5,000 adjustment that had already been made to the purchase price. Although it is true that the parties, in reaching the final purchase price, did make adjustments of $5,000, $2,500 each for "bad" accounts receivable and for obsolete inventory, there was no evidence at trial to show that these specific items were taken into account in preparing the February 29 balance sheet. Defendant's accountant did testify that $5,000 of the $9,000 reduction in inventory value shown on the February 29 balance sheet "had been deducted in the sales price," but this testimony is not accurate. In fact, as stated above, the parties reduced the sales price only $2,500 with respect to inventory, and that reduction was only for *obsolete* inventory. If the $9,000 reduction in inventory did not take obsolete inventory into account—and from this record we cannot tell whether it did or not—then defendant would have no reason to complain of a double deduction. Similarly, there was no evidence that the reduction in accounts receivable shown on the February 29 balance sheet was due to writing off "bad" accounts.

■ Finally, defendant argues that he should have been entitled to attorney fees in the trial court because the court erred in allowing the $5,000 deduction. Although we have modified the court's decree and judgment as to the amount of the reduction from the stated purchase price, we have not modified the decree as to the claimed double $5,000 deduction. The plaintiffs remain the prevailing parties and are therefore entitled to attorney fees in an amount set by the trial court. The contract provides, "* * * the prevailing party shall be entitled to recover * * * such sum as the Court may adjudge reasonable as attorney's fees."

The decree is modified and the cause remanded to the trial court for entry of a decree in conformance with this opinion. Costs to neither party.